Botsford, J.
This action concerns personal injuries sustained by the plaintiff Robert Douglas Powers (Powers) when the horse he was riding fell backwards. At the time, Powers was receiving horseback riding instruction provided by the Windhorse Dressage Academy (WDA) on a property in Sherborn, Massachusetts known as Woodlock Farm. Powers has brought negligence claims against Juanita Whitman (Whitman) and Diana Mukpo (Mukpo), instructors at the WDA, and *536 Arlyn and Alfred DeCicco (the DeCiccos), the owners of Woodlock Farm. The DeCiccos now move for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons below, the DeCiccos’ motion for summary judgment is allowed.
Background
The summary judgment record reveals the following facts; any factual disputes that exist have been resolved in the light most favorable to the plaintiff. Beginning in June or July 1996, Powers began taking horseback riding lessons from Juanita Whitman, who was an instructor and agent of WDA. Powers paid Whitman directly for the lessons. Powers separately paid Diana Mukpo, the principal of WDA, for the lease of the horse he used in his lessons; the lease cost was $630 per month.
WDA is a business involved in training dressage horses, teaching horseback riding and importing horses to sell. At all times relevant to this case, WDA was located at Woodlock Farm, a fifteen-acre property in Sherborn that is owned by the DeCiccos. On the property is a large horse barn with thirty stalls, an indoor riding arena, two outdoor arenas, fifteen turnout paddocks, and a residence where the DeCiccos live. The DeCiccos operate a licensed riding school at Woodlock Farm, and also lease portions of the barn to persons who conduct their own horse-related businesses from the space they lease; WDA was one of those businesses.
WDA and Woodlock Farm entered into a written lease agreement on or about May 1, 1996. The agreement provides for the lease of individual stalls by WDA for $500 per month for each stall, which fee is to cover bedding, shavings, hay and grain, and the use of paddocks. However, under the lease, WDA is responsible for maintenance of the stalls and care of the horses boarding in them. The lease states that Woodl-ock Farm will make available “arena time” and indoor as well as outdoor areas to accommodate the lesson and training requirements of WDA, but goes on to state expressly that Woodlock Farm “shall not charge WDA teachers a percentage of income from lessons or training.” There is no evidence presented that either DeC-icco played any role in or had any connection to the riding lessons or horse training offered by WDA at Woodlock Farm. Rather, it appears that the two riding “schools” run by WDA and the DeCiccos, respectively, operated completely independently of each other.
In 1996, Arlyn DeCicco was in charge of the day-today activities of Woodlock Farm; Alfred DeCicco maintained the books and handled billing. The riding school operated by Arlyn DeCicco at Woodlock Farm was licensed by the Commonwealth, as were the individual riding instructors working for Woodlock Farm, including Arlyn DeCicco. When it first moved to Woodlock Farm and at least as ofSeptember 1996, WDA was not licensed as a riding school, and none of its instructors, including Whitman and Mukpo, was licensed individually as a riding teacher. (Whitman and Mukpo became licensed in the spring of 1997.) The DeCiccos knew or reasonably should have known that Whitman and Mukpo were not licensed by the Commonwealth as horseback riding instructors at the time WDA began offering riding lessons at Woodlock Farm, which was months before September 20, 1996.[2]
On or about June 22, 1996, Powers signed a release form in connection with his receiving instruction at Woodlock Farm. It appears that Whitman gave him the form, but the form itself has a logo of Woodlock Farm, and in its text mentions only Woodlock Farm, hi particular, the form states in relevant part as follows:
RELEASE FORM

PLEASE READ THIS DOCUMENT CAREFULLY AND DO NOT SIGN IT UNLESS YOU FULLY UNDERSTAND IT.

Student’s Name
I recognize the inherent risks of injury involved in horseback riding generally and in learning to ride in particular. In taking lessons at Woodlock Farm, I assume any such risk of injury and further, I voluntarily release Woodlock Farm, its instructors, and agents from any responsibility on account of any injury I or my child or ward may sustain while receiving instruction or while riding in connection therewith, and I agree to indemnify and hold harmless Woodlock Farm, its instructors, and agents on account of any such claim . . .
WARNING
Under Massachusetts Law, an equine professional is not liable for an injury to, or the death of, a participant in equine activities resulting from the inherent risks of equine activities, pursuant to Chapter 128, Section 2D of the General Laws.
Student Date
Powers printed his name on the top line of the release form after “Student’s Name,” and signed the release on the bottom line after “Student.”[3]
Powers came to Woodlock Farm on September 20, 1996, for a riding lesson with Whitman. At Whitman’s direction, he mounted a horse named Take-A-Chance, a horse that WDA had recently arranged to come to Woodlock Farm;[4] the DeCiccos had no connection to Take-A-Chance. Take-A-Chance had some history of rearing on his hind legs and on September 12, 1996, had received in his hock an injection of artificial joint fluid and an anti-inflammatory because of right hind leg stiffness, pain and positive flexion. He was given a prescription for post-injection pain. On September 20, very soon after Powers mounted the horse, he reared on his hind legs and then fell back on Powers, causing very serious injuries to Powers’s hip and back.
Discussion
The DeCiccos’ principal argument is that the release signed by Powers entitles them to immunity from *537 suit. I agree. The release provides that “[i]n taking lessons at Woodlock Farm,” Powers (1) assumes the risk of injury, (2) releases Woodlock Farm “from any responsibility on account of any injury” sustained “while receiving instruction or while riding in connection therewith,” and (3) indemnifies “Woodlock Farm, its instructors and agents on account of any such claim . . .”[5] Powers acknowledges that he. read the release before signing it, and is deemed to have understood it, despite his deposition testimony to the contrary. See Cormier v. Central Mass. Chapter of the Nat’l Safety Council, 416 Mass. 286, 289 (1993) (“[t]he plaintiff had an opportunity to read the release and is deemed to have understood it” [footnote and citation omitted!); Lee v. Allied Sports Assocs., 349 Mass. 544, 550-51 (1965).
A general release that applies to a future claim or a right that has not arisen is enforceable in Massachusetts. See Cormier, 416 Mass. at 288-89; Lee, 349 Mass. at 550; Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass.App.Ct. 17, 19 (1997); Gonsalves v. Commonwealth, 27 Mass.App.Ct. 606, 608 (1989). Moreover, a general release applies to claims of negligence even though that word is not itself mentioned, and even though the releasing party does not believe that negligence is included within its scope. See Cormier, 416 Mass. at 288, 289. “An agreement, like the one before us, placing the risk of negligently caused injury on a person as a condition of that person’s voluntary choice to engage in a potentially dangerous activity ordinarily contravenes no public policy of the Commonwealth.” Id. at 289.[6] Moreover, the fact that Powers was an “inexperienced consumer . . . purchasing instructional services involving an activity which poses some degree of physical danger,” id., does not remove this case from the scope of the ordinary rule. See id.
The decisions just cited make clear that the DeC-iccos could validly seek and obtain a release from Powers for any claims of negligently caused injury. Powers argues, however, that the actual release he signed is not valid or enforceable by the DeCiccos for several reasons. First, he claims that the release is incorrect because of what he views as its misdescription of G.L.c. 128, §2D (§2D).[7] His point is that §2D contains exceptions to the general grant of nonliability to equine professionals, and the summary of §2D appearing in the release after the word “warning” (see p. 4 above) does not describe those exceptions or even indicate that there are any. The argument fails because the exact language in the release describing §2D is prescribed by §2D itself. See §2D(d)(2).[8]
Powers’s second contention is that the release is ambiguous because it does not clearly delineate the contracting parties. It is true that a principal focus of the release is on riding instruction and injuries received while instruction is being given, and that the description of §2D mentions only “equine professional[s[,” that is, persons who provide riding instruction, and does not mention “equine activity sponsor[s]” namely, those who own the property on which the instruction is taking place. It is also true that no “equine professional” employed by Woodlock Farm was offering instruction to Powers. However, the release by its terms applies to Woodlock Farm as an entity separate from its instructors and agents:
In taking lessons at Woodlock Farm, I assume such risk of injury and further, I voluntarily release Woodlock Farm, its instructors, and agents from any responsibility on account of any injury I . . . may sustain while receiving instruction or while riding in connection therewith, and I agree to indemnify and hold harmless Woodlock Farm, it instructors, and agents on account of any such claim.
(Emphasis supplied.) I agree with Powers that the release is ambiguous in relation to the parties protected by its terms, but the ambiguity concerns not Woodlock Farm, which is clearly covered, but Whitman and Mukpo, the riding instructors for WDA. In other words, the ambiguity does not assist Powers in his claim against Woodlock Farm and the DeCiccos.[9]
Powers further argues that the release is ineffective in this case because no release will be enforced to protect a person from the consequences of either noncompliance with a statutory duty or of conduct constituting more than negligence,[10] and in his view, the DeCiccos are culpable on both grounds by permitting WDA and its instructors to offer riding lessons without being properly licensed. I disagree. With respect to statutory duty, while Mukpo and Whitman were required by statute to obtain licenses before providing riding instruction, see G.L.c. 128, §2A, Powers does not point to any statute which correspondingly obligated the DeCiccos, as lessors, to insist that the two women did so.[11]
Insofar as conduct more blameworthy than negligence is concerned — e.g., gross negligence — it is highly questionable that as lessors, the DeCiccos owed a legal duty to one in Powers’s position to ensure that their lessee, WDA, employed only licensed riding instructors. See Thorson v. Mandell, 402 Mass. 744, 748 (1988) (property owner (YWCA) that simply rented its auditorium to theatrical producer was not liable to actress injured in a performance rehearsal organized and supervised by producer: “We find no support in cases or in logic for the principle that the YWCA had a legal duty to investigate the competence of [the theatrical producer] and his staff’).[12] But even if one assumes such a duty existed, the summary judgment record contains no facts that would support a conclusion that the DeCiccos, in continuing to allow WDA to offer riding instruction at Woodlock Farm even though they knew or should have known the WDA instructors were not licensed in Massachusetts, acted in a way that constitutes gross negligence.
*538 Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence.
It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise • ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care. It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons maybe affected. It is a heedless and palpable violation of legal duty respecting the rights of others. The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence . . .
Altman v. Aronson, 231 Mass. 588, 592 (1919). Accepting for argument that Whitman’s and Mukpo’s violation of the statutory licensure requirement could be considered as some evidence of negligence on the DeCiccos’ part, I found no indication in this case that before the date of Powers’s injury, Whitman (or Mukpo) in fact provided riding instruction at Woodlock Farm in a careless, or less than competent manner, and more to the point, no evidence that the DeCiccos were aware of such conduct. Considered in a light most favorable to Powers, the facts here indicate at the most that the DeCiccos were negligent in not insisting that their lessee comply with the applicable Massachusetts license requirements, but not negligent to the “magnified” degree that would transform the conduct to gross negligence.[13]
Powers also seeks to avoid the effect of the release by claiming that the DeCiccos are liable to him on a theory of private nuisance. The argument lacks merit.
A private nuisance is actionable when a property owner creates, permits, or maintains a condition or activity on his property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another.
Asiala v. Fitchburg, 24 Mass.App.Ct. 13, 17 (1987) (citations omitted). “The private nuisance standard... requires two different parcels of property: one on which the nuisance condition exists, and another whose occupants are burdened by the nuisance.” Doe v. New Bedford Housing Authy., 417 Mass. 273, 288 (1994). Powers does not claim, nor could he on the facts presented, any interference by the DeCiccos with any property right of which he is possessed.
Finally, Powers argues that the DeCiccos are liable because they permitted an inherently dangerous activity to take place on their land, viz., horseback riding. This claim must also be rejected. As the owners of Woodlock Farm, property on which horseback riding and horseback riding' instruction takes place, the DeCiccos are “equine activity sponsor(s)” within the meaning of §2D,[14] and are licensed as such. Accordingly, they are entitled to the immunity provided by §2D(b): "... an equine activity sponsor . . . shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities . . ,”[15] Nor can Powers recover on a theory that Mukpo and Whitman were performing work on the DeCiccos’ property that was inherently dangerous or probably going to result in injury. See Whalen v. Shivek, 326 Mass. 142, 150 (1950). The fatal flaw in the analysis is that Mukpo and Whitman were lessees of Woodlock Farm, not independent contractors employed by the farm or the DeCiccos. Status as an independent contractor is a prerequisite for a finding of liability on the theory advanced here.
In sum, the DeCiccos are entitled to summary judgment in their favor because they have shown as matter of law that Powers will be unable to prove a viable claim of liability against them.
ORDER
For the foregoing reasons, the motion for summary judgment of Arlyn L. DeCicco and Alfred DeCicco is allowed.

 There is evidence that the DeCiccos or their employee Cindy Brown asked Whitman and Mukpo to post their licenses or to show the DeCiccos their licenses on a number of occasions before September 20, 1996, but the requests went unmet, as would follow from the fact that Whitman and Mukpo were not licensed at that time.

 On the copy of the release form in the summary judgment record, the initials “WDA” and “JW” have been handwritten near the top of the form. Powers testified in his deposition that he did not know if these initials were on the form at the time he signed it.

 Take-A-Chance was owned by a Rachel Williams, but in or around August or September 1996, she had made an arrangement with Mukpo and Whitman pursuant to which they would stable the horse at Woodlock Farm, Whitman would give riding lessons to Williams, and, it appears, Whitman and Mukpo could use the horse for instructional purposes with other students.

 The release is quoted above in the background section of this memorandum. There is no dispute in this case that “Woodlock Farm” is owned by the DeCiccos, and that if the release is valid as to Woodlock Farm, it is valid as to the DeCiccos.

 In light of this language, Powers’s claim that the release violates public policy must be rejected.

 Section 2D, which concerns the liability of persons involved in various forms of “equine activity” including riding instruction, provides that with certain exceptions, a person who qualifies as an “equine activity sponsor” (e.g., stable owner) or “equine professional” (e.g., a horseback riding teacher) is not “liable for an injury to or the death of a participant resulting from the inherent risks of equine activities . . .” The release signed by Powers contains a provision near its end stating:
WARNING
Under Massachusetts Law, an equine professional is not hable for an injury to, or the death of, a participant in equine activities resulting from the inherent risks of equine activities, pursuant to Chapter 128, Section 2D of the General Laws.

 Moreover, as the cases cited in the text above demonstrate, a voluntarily executed release of liability for ordinary negligence is valid regardless of whether a statute indepen *539 dently exists that offers a grant of nonliability or immunity from suit.

 Mukpo and Whitman oppose the DeCiccos' motion for summary judgment on the grounds that the release should also exempt them from liability. Whether or not the release reaches Mukpo, Whitman and the WDA is not raised by the DeCiccos’ motion, and I do not consider it beyond the mention just made in the text.

 See Henry v. Mansfield Beauty Academy, Inc., 353 Mass. 507. 511 (1968) (violation of statutory duty). See also Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass.App.Ct. 17, 19 (1997) (gross negligence).

 It bears noting that under the DeCiccos’ lease agreement with WDA, the DeCiccos were obligated only to provide stalls, paddocks and feed. The agreement contains no provisions linking the DeCiccos in any respect to the training and instruction to be provided by WDA at Woodlock Farm, except for making indoor and outdoor space available to WDA for these purposes.

 The court went on to remark that placing such a duty on the property owner “would be unreasonably onerous, particularly where there is no evidence that would have put the YWCA on notice of any inadequacies of [the producer] and his staff.” Thorson v. Mandell, 402 Mass. 744, 748-49 (1988). Powers emphasizes this language, stating that in contrast to the Thorson case, here the DeCiccos knew for up to twelve months that Mukpo and Whitman were not licensed. I accept for argument the distinction Powers draws between the Thorson case and this one, but I do not read Thorson as concluding that if the YWCA had known more about its lessee's alleged inadequacies than it did, the YWCA would then have owed a duty to the plaintiff to take additional steps to protect her from injury.

 Since I conclude that the facts here do not support a claim of gross negligence against the DeCiccos, it is plain that no claim of wanton or reckless conduct can survive. See Sandler v. Commonwealth, 419 Mass. 334, 336-40 (1995).

 Section 2D(a) contains definitions, and the term “equine activity sponsor” is there defined as “an individual, group, club, partnership, or corporation . . . which . . . provides the facilities for an equine activity, including but not limited to: . . . stable and farm owners and operators ...”

 As indicated previously (see note 6 above), there are exceptions to this grant of immunity, see §2D(c), but it is clear that none of them applies in this case. Powers suggests that the unlicensed status of Whitman and Mukpo was a “dangerous latent condition” on the property of Woodlock Farm that was known to the DeCiccos within the meaning of §2D(c)(2), but I consider the language of this provision plainly to refer to physical conditions of the land itself, not to the status of someone who works on the property.